IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

*FILED*

AUG 2 0 2010

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

ROBERTA C. CASTO,
**Plaintiff,**

v.

**Civil Action No. 2:09cv56**
**(The Honorable Robert E. Maxwell)**

MICHAEL ASTRUE,
Commissioner of Social Security,
**Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Roberta C. Casto ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security

("Defendant," and sometimes "Commissioner") denying her claim for Disability Insurance Benefits

("DIB") under the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is

awaiting decision on cross Motions for Summary Judgment and has been referred to the undersigned

United States Magistrate Judge for submission of proposed findings of fact and recommended

disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

Plaintiff filed an application for Social Security benefits on March 8, 2006, alleging disability

since July 2, 2005, due to bipolar disorder, conversion disorder, high blood pressure and diabetes (R.

94, 115). Plaintiff's application was denied at the initial and reconsideration levels (R. 64, 70).

Plaintiff requested a hearing, which Administrative Law Judge Donald T. McDougall ("ALJ") held

on November 26, 2007 , and at which Plaintiff, represented by Joan Mooney, and James Ganoe,

Vocational Expert ("VE"), testified (R. 20-61). On June 26, 2008, the ALJ entered a decision

finding Plaintiff had severe impairments, namely diabetes mellitus, obesity, hypertension, bipolar

disorder and conversion disorder, but was not disabled because she could perform past relevant work

as an FBI clerical worker or video store clerk (R. 14, 18 ). On September 26, 2008, Plaintiff requested review of the ALJ's decision by the Appeals Council (R. 7). On December 16, 2008, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 4-6). On February 18, 2009, Plaintiff wrote to the Appeals Counsel requesting an extension of time to file a civil action because she had been unable to contact her attorney, Ms. Mooney (R. 3). On April 1, 2009, the Appeals Counsel granted Plaintiff 30 days to file a civil action (R. 1). Plaintiff's complaint was filed May 4, 2009, by a new attorney, Michael Miskowiec.

## II. Statement of Facts

Plaintiff was born on October 29, 1975, and was thirty-two years old at the time of the ALJ's decision (R. 94, 9). Plaintiff graduated from high school in 1993 and had past relevant work as a legal instrument examiner and video store clerk (R. 122, 124).[1]

Plaintiff testified that she has bipolar disorder which has affected her since 1999 (R. 33). She was hospitalized due to manic episodes in 1999 for two weeks and in 2000, for a week-and-a-half, for depression. In 2001, she was again hospitalized due to a suicide attempt.[2]

Plaintiff was seen on consultation by Dr. Roger C. Toffle at the WVU Department of Obstetrics and Gynecology on February 2, 2000, for evaluation of secondary amenorrhea and primary infertility. Dr. Toffle opined the Plaintiff had chronic anovulation due to polycystic ovary

---

[1]Plaintiff returned to her job as a legal instruments examiner at the FBI from the end of August 2005 until October 28, 2005 (R. 128). The ALJ found this was an unsuccessful work attempt (R. 14).

[2]Plaintiff requested more time to obtain the records from 1999-2001, but the ALJ noted those were "quite old" and Plaintiff's alleged onset date was not until 2005, so he "did not see the point" of bringing those in (R. 4).

syndrome with associated insulin resistance. She had recent blood sugars in the 200's and may have developed frank Type II diabetes (R. 457-458). "We would want her to defer pregnancy until her insulin control has been achieved."

On June 7, 2002, Plaintiff was seen by Dr. Kenneth Morgenstern at the WVU Department of Ophthalmology for her annual diabetic eye exam (R. 455). "I have taken this opportunity to discuss diabetic retinopathy and the need for tight sugar control and adequate blood pressure control. As she is still a smoker, I have also discussed with her the risks that this poses to diabetic eye changes."

On August 7, 2002, Plaintiff was seen by Dr. Mark Dresbach at the WVU Obstetrics and Gynecology department for high risk pregnancy secondary to type 2 diabetes mellitus and hypertension. She had recently had a miscarriage, most likely due to uncontrolled blood sugar. She had received diabetic teaching while in the hospital early in her pregnancy (R. 453). "In regards to future pregnancies, it was explained to her that she has to have good blood sugar control, have her hypertension under control, and make some attempt at weight loss."

Plaintiff had an MRI of the brain on June 7, 2004, in which no acute intracranial abnormality was identified (R. 451).

On July 20, 2004, Plaintiff was seen at University Health Associates - WVU Department of Neurology with diagnoses of: 1) tremor of unknown etiology; 2) hypertension; 3) diabetes mellitus; and 4) mood disorder. Plaintiff was also morbidly obese (R. 449).

In a letter dated August 12, 2004 Dr. Conrad Failinger stated Plaintiff should keep a careful eye on her blood pressure to make sure it did not begin to rise again and to monitor for preeclampsia. He noted Plaintiff had had three miscarriages and this was the first time a pregnancy had gone this

far. Plaintiff weighed 295 pounds (R. 447-448).

On September 23, 2004, Dr. Michael Cunningham performed an ultrasound examination agreeing it showed that Plaintiff was 30 weeks pregnant. She had her baby the end of November.

Five months later, on May 9, 2005, Plaintiff presented to the emergency room with a chief complaint of depression (R. 196). Plaintiff's weight was 315 and her height was 5'4" (R. 199). She had been feeling depressed and having crying spells for 4-5 weeks. She had been off of her medications due to pregnancy and breast-feeding. She was requesting outpatient treatment and an appointment was scheduled with psychiatrist Dr. Shahnaz Younus. Plaintiff was to stop nursing her infant and return to taking Seroquel(25 mg.) (R. 192).

Plaintiff was seen by psychologists Heidi Taylor and Peggy Wolfe for counseling from June 1, 2005 thru June 21, 2006 (R. 301-353). At her first visit she described herself as depressed but a little better. Her affect was congruent and appropriate, but depressed and tearful. She showed signs of anxiety. Plaintiff's first session with Ms. Taylor was focused on her three miscarriages and her recent diagnosis of bipolar disorder (R. 353).

On June 9, 2005, Plaintiff reported to Ms. Taylor feeling "a little better" (R. 350). Her affect was still congruent, appropriate, but depressed. Her treatment was listed as "cognitive behavioral therapy" focusing on her three miscarriages.

On June 14, 2005, Plaintiff reported to Ms. Taylor that she was "somewhat less depressed" (R. 347). Her affect was still congruent, appropriate, flat, and depressed. The session was focused on her miscarriages.

On June 20, 2005, Plaintiff reported to Ms. Taylor that she felt "much better, still a little anxious at work" (R. 345). Her affect was congruent and appropriate, but now also pleasant and

4

related, instead of depressed and flat. The therapy was focused on Plaintiff's struggle to accept her bipolar diagnosis.

On June 30, 2005, Plaintiff seemed angry and upset and her medications of Ativan and Lamictal were not working (R. 343). She was hypomanic, could not sleep, and her mind was racing. Her mood was irritable and her affect was annoyed, anxious, tense, and worried. She was instructed to discontinue the Lamictal and Zoloft was added as it was thought her medications might be making her more manic (R. 344).

Plaintiff's alleged onset date is July 2, 2005.

Plaintiff was again treated at the ER, and was then transferred and hospitalized at Chestnut Ridge Hospital on July 3, 2005, after her husband brought her to the emergency department with complaints of four weeks of worsening depressive symptoms, racing thoughts, and mood swings.[3] Upon admission it was noted that she had difficulty speaking, a slow response, and difficulty answering the interviewer's questions. She admitted she had thoughts of hurting herself with a gun (R. 14). She had been taking Lamictal until seven days earlier, when it was stopped due to a rash, considered a serious side effect of that medication (R. 214). She was admitted by Dr. Carlos Jordan-Manzano, who diagnosed bipolar disorder, recently depressed, with a Global Assessment of Functioning ("GAF") of 20-30.[4] On the second day of her admission, Plaintiff was found to have

---

[3]As noted earlier, Plaintiff testified she also had been hospitalized due to bipolar disorder in 1999, 2000, and 2001.

[4]A GAF of 21-30 indicates **Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day, no job, home, or friends).

severe thought blocking, and episode of ataxia[5] and "head bobbing" which was resolved after treatment with Ativan. She was placed on Lithium and Ripserdal.

A Neuropsychiatric Interview was performed and revealed major depressive disorder with a diagnosis of provisional bipolar disorder. Plaintiff was discharged from Chestnut Ridge Hospital four days after her admission, on July 7, 2005. Her discharge medications were Hydrochlorothiazide, Enalapril, Metformin, Lithium, and Ambien (R. 212-213). Her GAF upon discharge was 55-60.[6]

Plaintiff followed up with Ms. Taylor following her hospitalization on July 11, 2005 (R. 341). Plaintiff said she felt "better." Her affect was congruent and appropriate, but depressed.

Plaintiff followed up with Ms. Taylor on July 19, 2005, at which time she reported: "I'm having muscle weakness and it's frightening me" (R. 339). Her affect was congruent and appropriate, but worried. The session was focused on her chronic health problems. Her defense mechanism was reported by the therapist to be "somaticization."

On July 25, 2005, Plaintiff told Ms. Taylor she was "tired all the time" (R. 337). Her affect was congruent, appropriate, depressed and agitated. Therapy focused on "stress about returning to work." Ms. Taylor identified somaticization as a defense mechanism.

On August 8, 2005, Plaintiff told Ms. Taylor her legs weren't working right (R. 335). Her affect was congruent, appropriate, worried, and depressed. The session was focused on chronic

---

[5]Ataxia is defined as failure of muscle coordination. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, at 172 (31st ed. 2007).

[6]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

health problems.

On August 11, 2005, plaintiff told Ms. Taylor she was feeling somewhat better, but fatigued (R. 333). She did not sleep well, although Ambien was helping. Her legs felt weak and uncoordinated. Her mood was "ok" and her affect was calm, comfortable, pleasant and friendly.

On August 23, 2005, Plaintiff reported to Ms. Taylor that she had "started back to work and was a little anxious" (R. 331). Her affect was congruent, flat, and depressed. The session was focused on her return to work.

Dr. Younus referred Plaintiff to Dr. Mouhannad Azzouz for her walking problems. Dr. Azzouz examined the Plaintiff on August 30, 2005 and noted she was obese and her walking problems got worse while she was pregnant (R. 234-236). Test and exam results were normal. He diagnosed her with intermittent speech and gait symptoms.

On September 2, 2005, the Plaintiff underwent an MRI of the brain which was essentially unremarkable (R. 239). Plaintiff also underwent a color doppler duplex scan on both carotid systems on that same date because of her headaches, slurred speech and right-sided weakness. Dr. David McLellan interpreted the results as no significant plaque disease or internal carotid artery stenosis noted on either side (R. 240-241).

Plaintiff saw Ms. Taylor on September 13, 2005, for followup (R. 329). She said she liked the shift she was on at work. She reported that all her tests had been negative. The next day Plaintiff reported feeling "really well" (R. 327). Her affect was pleasant. The session was focused on her adjustment to going back to work. Mr. Taylor found Plaintiff "currently stable" and decreased her therapy sessions to monthly.

On September 20, 2005, Plaintiff was seen regarding her difficulty walking at the Neurology

Clinic at WVU. There was no neurological deficit in her physical examination to explain her leg weakness. Plaintiff was to follow up with her primary care physician regarding weight reduction (R. 443).

On October 11, 2005, Plaintiff was seen at University Health Associates ("UHA") by her family doctor, Michael Campbell, M.D. for hypertension as well as fatigue (R. 376). She reported she had seen a neurologist regarding fatigue and tremors. Both a carotid Doppler and an MRI performed by the neurologist were normal. Her weight was up from 306 to 314. Hypertension appeared to be well controlled with Enalapril 10, Hydrochlorothiazide and an additional Enalapril 10 daily. The neurologist had reported Plaintiff's problem as a migraine headache. She was being prescribed lithium for her bipolar disorder. Dr. Campbell stated: "We strongly suspect that the patient is slowly adapting to the lithium dosage, and will have symptoms of fatigue and tremor resolved over time." Bipolar symptoms were being followed by Dr. Young [sic] at Chestnut Ridge (R. 376).

Plaintiff saw psychologist Taylor on October 31, for follow up (R. 325). She was upset and frustrated about her health issues. She had to leave early for an appointment with the neurologist. Her affect was anxious. Her new stressors included problems with walking. She was also seen by psychiatrist Younus that same day (R. 323). Her mood was "good." She felt there was something "not working right" when she walked. Work was better on her new shift.

Plaintiff was seen on follow-up October 31, 2005, by Dr. Azzouz for follow up of headaches and walking problems (R. 233). The headache was now gone but she still reported walking problems. She had had one episode with speech and gait difficulty. Examination was all normal. Dr. Azzouz diagnosed migraine variant and bipolar disorder.

Plaintiff stopped working the end of October, although apparently she did not actually quit.

Plaintiff saw psychologist Wolfe on November 10, 2005, for follow up (R. 321). Her mood was "anxious." Her affect was also anxious. She continued to focus on medical concerns. She was still missing work and brought an official document related to her extended missed work.

Plaintiff phoned Dr. Azzouz again on November 14, 2005, and stated she was currently taking Topamax and she still couldn't walk, her arms were weak, and she had tremors (R. 230). "She has had only one good day since her appt." which was two weeks earlier. Her mother also called to say that they needed to do more tests or "something to help" because Plaintiff wasn't getting any better.

On November 15, 2005, Plaintiff was seen by family doctor Dr. Campbell for a repeat episode of tremors and leg weakness and fatigue. She was started on Topamax for her "atypical migraines" by her neurologist and was continuing on Lithium per her psychiatrist. She had no other complaints but was "beginning to become frustrated with her episodes of weakness and tremor." Dr. Campbell suspected carpal tunnel syndrome most likely due to the recent birth of her child. He prescribed ibuprofen and gave her an explanatory handout, stating if she did not get better, he would prescribe wrist splints. He was still not clear on the etiology of the weakness and tremors, but opined that it could be atypical migraine, a side-effect of lithium or some other medication, or some other neurological process. He ordered more labs. Regarding bipolar disorder, Dr. Campbell opined: "Patient's mood seems to be under control with the lithium dosage. She does not seem to be expressing any depressive symptoms. We will continue to monitor as she is postpartum" (R. 230).

On November 17, 2005, Plaintiff saw psychologist Wolfe for follow up (R. 319). Plaintiff's mood was frustrated and her affect was worried. The session focus was on her health and work

concerns. She was to undergo further medical testing. She was attempting to remain positive about her health issues and their possible resolution.

Plaintiff saw Ms. Wolfe for follow up on December 7, 2005 (R. 317). She reported her mood was "pretty good," although her husband said she had been "crabby" the last few weeks. Her affect was pleasant. The session focus was on her still-unresolved health issues, and that she had still not returned to work.

Plaintiff was referred by Dr. Azzouz to the Cleveland Clinic for her walking problems. She was seen there by Dr. Rebecca Kuenzler on December 12, 2005, for "gait problems." Plaintiff reported she felt like her "right foot can't keep up with left"(R. 230). She first noticed trouble when she was ten weeks pregnant in 2004, and had trouble walking. It lasted three to four weeks and then totally resolved. The symptoms had been intermittent since then. They returned in May 2005, then went away again. They came back in July and lasted for six weeks. They reoccurred in October and had been present since then. It seemed worse if she exerted herself. Her right leg began to feel weaker, slightly dragging and turning in. She also had tremors in the hands and head. In the last few weeks it had been less of a problem, but she was not back to normal yet. It was noted the diagnosis of migraine had been discarded.

Her examination was deemed "entirely normal" and she was referred to "movement disorders" for further evaluation, where she was diagnosed with a continuing intermittent gait abnormality. "Considerations include dystonia and conversion disorder." Plaintiff's medications at that time were Lithium, Glucophage, Enalapril-Hydrochlorothiazide, Vasotec and Ascriptin (R. 247-250).

A Dystonia DNA Test was performed by Dr. Scott Cooper at the Cleveland Clinic on

December 16, 2005 (R. 245). "This individual does not possess the GAG946 deletion mutation in the DYT1 gene commonly associated with familial early onset generalized torsion dystonia and some cases of limb-onset focal dystonia."

Plaintiff was seen again by Dr. Kuenzler on December 16, 2005. It was noted that Dr. Cooper was concerned that the Plaintiff's leg symptoms could be due to a demyelinating condition or venous stroke "as she was apparently diagnosed as Factor V Leiden positive after a miscarriage." Physical examination of the Plaintiff by Dr. Kuenzler revealed astasia-abasia.[7] "Timeline of this abnormality by history is not compatible with demyelination or stroke, and MRI's of the brain and cervical spine have been negative." Dr. Kuenzler continued to suspect a conversion disorder (R. 243).

Plaintiff underwent an MRV of the brain and MRI of the brain on December 19, 2005 (R. 230). The MRV was unremarkable. The MRI of the brain was unremarkable "except for a small outpouching in the area of the right posterior communicating artery which most likely represents an infundibulum."[8]

Plaintiff saw psychiatrist Younus on December 22, 2005, for follow up (R. 315). Her mood was good but her affect was tense, worried, and tearful. They discussed the possible diagnoses, including conversion disorder.

Plaintiff saw Ms. Wolfe on December 28, 2005, for follow up (R. 313). Regarding mood, Plaintiff said: "I feel normal." Her affect was bland. She continued to focus on somatic issues. She

---

[7] Astasia-abasia is defined as motor incoordination with an inability to stand or walk despite normal ability to move the lower limbs when sitting or lying down, a form of hysterical ataxia. DORLAND'S, supra, at 169.

[8] A general anatomical term for a funnel-shaped structure. DORLAND'S, supra, at 952.

11

had inconclusive results from the Cleveland Clinic. She was still not working and was considered "AWOL" at work. She was fearful of driving alone to work, and also feared she could not make it in to work from the parking lot.

Plaintiff saw Dr. Younus on January 26, 2006, for follow up (R. 311). His diagnosis was now "rule out conversion disorder." She said she did not want to go on disability, she wanted to keep working. She reported her mood as "ok," but the doctor found her affect flat, nervous, and tense.

On February 10, 2006, Plaintiff saw family doctor Dr. Campbell primarily to seek referrals for physical therapy and podiatry as well as follow-up for diabetes and hypertension. She had episodes of tremors, leg weakness, and fatigue on-and-off since August 2005. The Plaintiff's current medications were Lithium, Hydrochlorothiazide/Enalepril, Metformin, Aspirin, Multivitamin, and B12 supplement. Her weight was 329 pounds up from 316, height 5 feet 4 inches. Dr. Campbell wrote:

> Neuromuscular symptoms. Letter from Dr. Cooper of the Cleveland Clinic was reviewed. The ideas that were considered were dystonia, paroxysmal movement disorder, or demyelinating disease or stroke; however, Dr. Cooper feels that these would be unlikely due to the fact that the MRI/MRV was normal. Psychogenic possibility was also discussed. His suggestion was to begin PT or podiatry for improvement of the ankle stability. As that was the patient's main request, we gave referrals for both physical therapy and podiatry.

Dr. Campbell was unsure what Plaintiff's diabetes control had been, since she reported she had not been taking her sugar level regularly. Her bipolar disorder was under control with lithium and therapy. Dr. Campbell would continue to keep conversion disorder in mind, although he stated: "Unlikely this is a diagnosis, but again treatment consists of regularly scheduled appointments with some help from SSRIs." Plaintiff was counseled on benefits of weight loss and smoking cessation

12

as well as establishing a routine exercise program (R. 374).

On February 23, 2006, Plaintiff was seen by Dr. W. Thomas Dickey at the West Virginia University Hospital emergency department with worsening leg tremors (R. 253). Plaintiff's symptoms returned to baseline while she was in the emergency department and no tests were therefore performed. Plaintiff was instructed to follow-up with her regular provider (R. 256).

On February 24, 2006, Plaintiff was seen by family doctor Sevastiani Petridou, M.D. (also at University Health Associates) for progressive difficulty walking and weakness of the lower extremities. She also reported some jerky movements of her arms, as well as tremors and shaking. She also reported some blurry vision this date and frequent eye twitching. "The patient has had an extensive workup by a neurologist in Cleveland [for] rule out the diagnosis of dystonia and MS." It is noted the Plaintiff made an attempt at physical therapy, but she only followed up for one session. It was recommended that she start physical therapy more diligently. Her weight was 335 pounds which was up by 20 pounds since November 2005. It was recommended that she follow up with one physician at all times since her case was quite complicated and it did not serve her any benefit to have multiple physicians (R. 373).

Plaintiff saw Ms. Wolfe on March 6, 2006, for followup (R. 307). Plaintiff described her mood as "pretty stable." Her affect, however, was bland and worried. Plaintiff's focus remained on her somatic symptoms and application for disability.

On March 17, 2006, Plaintiff was seen by family doctor Dr. Campbell for assessment of diabetes as well as the issue of intermittent tremors, leg weakness, and fatigue that had been going on since August 2005. Weight was 339 up from 335. Plaintiff reported a decrease in tremors since her last visit, but was still feeling fatigued and weak. She reported she went to PT several times,

even though it was exhausting. Podiatry did not believe physical therapy would do that much good in terms of her ankle, although she would be getting an orthotic. Spasm of the right eyelid was noted during the exam. The doctor stated that it was difficult to discern whether Plaintiff's chronic fatigue syndrome-like symptoms were neurological or psychological in orientation. "Given patient's history of bipolar disorder, it is certainly possible that this could be an expression of some sort of depressive symptoms." Plaintiff was started on Wellbutrin for augmentation of energy and possible treatment of atypical depression.

On March 21, 2006, Plaintiff saw Ms. Wolfe for follow up (R. 305). She reported her mood as "pretty good," while her affect was noted to be bland. Therapy focused on ongoing health issues with a somatic focus with minimal emotion. Ms. Wolfe noted: "Continues with minimal emotional reaction to ongoing stressor of physical symptoms of unknown origin." It was also noted that the family doctor added Wellbutrin.

Plaintiff saw psychiatrist Younus the same date (R. 303). Dr. Younus stated that Plaintiff's alertness had been helped by Wellbutrin, but she was not sleeping well, and now had manic episodes. Her family doctor now suspected chronic fatigue syndrome. She still had Ambien, which helped her sleep in the past. She had gained 20 pounds over the summer. Her mood was good.

On April 21, 2006, Plaintiff saw Dr. Campbell for follow up of her diabetes, hypertension and intermittent tremors (R. 370). Plaintiff had stopped taking Wellbutrin because it was making her agitated and possibly causing her to settle into the beginning of a manic phase. "[W]hen she started taking it, she was not sleeping well for about a week and then her thoughts began to race. She also had increased jerking and tremor while she was on it. When she stopped it, the tremor seemed to decrease and ever since then she states that her energy and tremor have been generally okay." Her

weight was down to 336 pounds. There was discussion of possibly putting Plaintiff on Byetta for glycemic augmentation and weight loss but it was discovered she had never been referred for diabetic education so she was sent there first to reinforce lifestyle changes. Regarding the physical symptoms, Dr. Campbell noted:

> Still cannot rule out possible conversion disorder. Still considering the idea that the lithium is at the root of most of this. At next visit may recommend suggesting to her psychiatrist to switch her lithium to another mood stabilizer, such as Lamictal or Tegretol.

On May 8, 2006, State agency reviewing psychologist Bob Marinelli, Ed.D., completed a Mental Residual Functional Capacity ("MRFC") assessment of the Plaintiff (R. 282-284). He opined Plaintiff had moderate limitations in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. She was either "not significantly limited" or there was "no evidence of limitation" in any other category. Dr. Marinelli concluded:

> Claimant's MRFC is reduced by moderate limitations in sustained persistence. She has the capacity for routine competitive employment involving short & simple to mildly complex instructions with low pressure demands.

Dr. Marinelli also completed a Psychiatric Review Technique ("PRT") of Plaintiff that same date based on 12.04, Bipolar Syndrome (R. 289). He did not include any somatoform disorder. Dr. Marinelli then opined that Plaintiff would have a mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and had had one or two episodes of decompensation, each of extended duration (R. 296).

Dr. Marinelli had reviewed records from July 2005 until March 17 2006, and noted:

> ADL's indicate that the clmt goes to the mall to walk, visits family, is able to follow written and spoken instructions. Needs reminders for meds. Conc, task completion & social functioning reduced during periods of manic or depression.

Dr. Marinelli also found that Plaintiff's reports of functioning were consistent with her MER and were considered credible.

On May 15, 2006, Plaintiff was seen by nurse practitioner Beth Minchau at University Health Associates, reporting that she was pregnant and wanting to review safety issues on several medications. She was currently being weaned off Lithium after having consulted with her psychiatrist. She was to be switched to a blood pressure medication that was considered safer during pregnancy. She planned on seeing Dr. Lotshaw for her obstetrical care and she had a past history of three early miscarriages. She was morbidly obese and to be taken off of her ACE inhibitor and switched to Methyldopa. Frequent blood pressure and blood sugar monitoring were encouraged, as was stopping smoking (R. 369).

Upon examination, Plaintiff's blood pressure was high. The remainder of her vital signs were within normal limits. She appeared to be in no acute distress. Her affect was within normal limits and she behaved and interacted appropriately. She was visibly excited about the pregnancy.

On May 26, 2006, Plaintiff saw Dr. Campbell for complaints of increased congestion, occasional cough, and noticeable wheezing with exertion (R. 368). She said she had been diagnosed before with allergy-induced asthma for which she was treated with albuterol. She also reported that "since her pregnancy began, she has stopped the lithium and her ACE inhibitor." She also stated that she had not had any mood problems despite not taking any psychiatric medications. Significantly: "Additionally, coincidentally since she has been off the lithium, she has not experienced any more

16

increased fatigue or tremor." Her weight was up from 337 to 349 pounds and she was still smoking. She was given prescriptions for Rhinocort Aqua nasal spray, Zyrtec, Advair Diskus as well as albuterol inhaler (R. 368).

On May 30, 2006, Plaintiff was seen at University Health Associates for pregnancy. She was noted to have : (1) Type II diabetes; (2) chronic HTN; (3) recurrent SAB; (4) history of bipolar disease (no current meds - mood good); (5) history of pulmonary stenosis; (6) history of abnormal pap; (7) prior LSTCS; and (8) morbid obesity (R. 364-365).

On June 23, 2006, the Plaintiff saw Dr. Campbell for follow-up of her diabetes, hypertension, hyperlipidemia, and allergy induced asthma. Her weight was 337 at approximately 9-1/2 weeks gestation. She was high risk OB with hypertension; seasonal allergies; history of bipolar disorder; and hyperlipidemia. Her energy level was generally better which could be attributed to being off the lithium and her twitching tremors had decreased. She occasionally had the eye fluttering. It was strongly recommended that her psychiatrist place her on a different bipolar maintenance medication (R. 367).

On July 10, 2006, Plaintiff saw Ms. Wolfe for follow up. She was appropriately dressed, with managed hygiene and normal speech. She denied any depression. Her affect was calm, pleasant, consistent, congruent, appropriate, and related. Her thought processes were coherent with no abnormal thought content. She expressly denied depression, and her pregnancy was apparently going well. The psychiatrist explained the possibility of conversion disorder and possible stressors or triggers. Plaintiff reported no current walking symptoms although still reporting eye closing symptoms. She had had three miscarriages, which were stressors, and found her FBI job stressful.

Plaintiff next saw Ms. Wolfe on July 19, 2006, for follow up (R. 434). Her mood was good

with no depression or anxiety. Her affect was comfortable and pleasant. She was found to have a history of bipolar, now off Lithium due to pregnancy. She denied depression or mania or mood swings, slept good and had a good appetite. Her social life was with her family and neighbor, but she did keep in touch with a few friends by phone. She identified no problematic symptoms. Finances were her primary stressors. In terms of therapy she wanted to focus on stress relief, so they covered breathing exercises.

Plaintiff next saw Ms. Wolfe on August 3, 2006, for followup (R. 432). She denied any depression or stress. Her affect was comfortable and pleasant. Her pregnancy was going well with no manic symptoms, irritability or racing thoughts. Her sleep was ok. They discussed the history of her illness and stressors with a focus on work. She identified no specific trigger. Walking was good with no problems. She reported that her walking got better as soon as she went off Lithium, but she did have walking difficulty while pregnant the last time and was not on Lithium at that time. They worked on breathing exercises.

Plaintiff saw Dr. Younus on August 9 for followup (R. 430). She reported she was better, with no problem walking. She still had some problems with her eye. Her mood was pretty good. She reported no manic or depressive symptoms. She was "doing well." Her affect was comfortable and pleasant. Plaintiff was still on no medications and discussed restarting meds if mania or depression restarted.

On August 9, 2006, State agency reviewing psychologist Joseph Kuzniar, Ed.D., completed an MRFC and PRT, based on 12.04 for Bipolar Disorder (R. 385-402). He did not make a finding regarding a somatoform disorder. In his MRFC, Dr. Kuzniar opined that Plaintiff would be moderately limited in her ability to perform activities within a schedule, maintain regular attendance,

and be punctual within customary tolerances; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. There was either no evidence of limitation or she was "not significantly limited" in any other category.

Dr. Kuzniar added:

> The RFC ratings shows the capacity to carry out routine instructions and the capacity to manage social interaction demands. When the symptoms of the bipolar impairment are evident, the capacity to carry out routine instructions is somewhat reduced and as [sic] are the capacity to manage social interactions. The capacity for adaptation is less than markedly reduced.

In his PRT Dr. Kuzniar opined Plaintiff would have mild restriction of activities of daily living and mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and had had one or two episodes of decompensation, each of extended duration (R. 399). He had reviewed records from February 2006, until June 27, 2006, and stated:

> The claimant stopped lithium when she became pregnant. The function report stated she has problems with [bipolar disorder] when stressed and will do things out of character. Full credibility is indicated as the function report statements are generally consistent with the MER.

Plaintiff next presented to Ms. Wolfe on August 31, 2006 for follow up (R. 428). Her mood was good and her affect was euthymic, comfortable, and pleasant. Her pregnancy was going well. She did have increased concerns about finances. She acknowledged being worried about this, but reported she did not allow herself to dwell on it. Her legs were still feeling fine, although she still had some problems with her eye closing.

On September 10, 2006, Dr. John F. Brick, WVU Department of Neurology, performed an

EEG, which was within normal range (R. 440).

On September 27, 2006, Cindy Osborne, D.O., a State agency reviewing physician, completed a Physical Residual Functional Capacity Assessment (R. 403-410). Dr. Osborne opined that plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could stand/walk at least 2 hours in an 8-hour workday, and could sit about 6 hours in an 8-hour workday. She could never climb ladders, ropes or scaffolds and could occasionally perform all other postural movements. She should avoid concentrated exposure to cold and hazards. Based on the medical and non-medical information in the record, Plaintiff was found to be partially credible (R. 410).

Plaintiff next presented to Dr. Younous on November 1, 2006, for followup (R. 426). Her baby was due in January 2007. Without medications she was a "little more moody, some days better than others." Her coordination was better since pregnancy. The weekend before she had a day without walking very well, which lasted 3-4 hours. It eased up as the day went on, whereas before it would worsen through the day. She still had eye twitches. Her mood was "ok" but her affect was tense, gloomy, worried, and tearful. Her thought content was of hopelessness and helplessness. She was on no medications.

Plaintiff saw Ms. Wolfe one week later for followup (R. 424). She seemed more animated than usual– anxious and stressed out. Her affect was annoyed, frustrated, and anxious. Plaintiff complained of resumption of physical symptoms over the last two nights. She still attributed her symptoms to medications. Her sleep was ok. She had recently been told she had a tumor on her ovary.

On November 14, 2006, Dr. Zadeh, a neurology resident, reported that based on the results of the MRI and EEG the Plaintiff's transient spells of bilateral upper extremity tremors were not

likely epilepsy (R. 439). He also reported that "at this point" the frequency of Plaintiff's tremors was once every other month, although prior to her pregnancy they could occur on a daily basis and last a week or so.

Plaintiff presented to Ms. Wolfe on November 16, 2006, for followup (R. 422). Her mood was improved and her affect was again comfortable and pleasant. She had spoken to another neurologist who felt there may need to be further testing once the baby was born, and that they would need to do an EEG while symptoms were occurring. Plaintiff reported no current leg symptoms, and only slight eye symptoms. Her irritability was resolved and her sleep was better. The doctor discussed still trying to explore possible stressors regarding possibility of conversion disorder. The most recent symptoms occurred when she was under increased stress helping her mother prepare for a baby shower.

On February 15, 2007, plaintiff followed up with Dr. Younous (R. 420). She had had the baby. She was extremely irritable, had crying spells, and was not doing well. Her mood was "sad" but her affect was still comfortable, pleasant, and friendly. The doctor reported she would need to restart medications. Plaintiff was to go to ER if her symptoms got worse. At a family session that same day, Plaintiff reported feeling "pretty good" although her "stress level was up" and she was "overwhelmed." She reported crying spells three to four times a day. Her energy was ok, and she enjoyed the children. Her appetite was decreased—she just "pick[ed]" at food. Her affect was anxious, fearful, depressed, worried, tearful, and overwhelmed. Her concentration was good. She had no thoughts of harm of any kind. The issues were listed as "ongoing" with the added stress of birth of new child a month earlier and adjustment issues with the older child. Plaintiff and her husband identified Plaintiff's mental symptoms as similar to symptoms after the birth of their first

child, and feared they would escalate as they did then. Dr. Younous prescribed Depakote.

On March 22, 2007, Plaintiff presented to Ms. Wolfe for followup (R. 416). She was diagnosed with conversion disorder, no factitious disorder, and bipolar disorder. She had no crying spells, and was not depressed. She was resting well. Her mood was good and her affect was appropriate. She said she felt "spacey" on Abilify. She had similar symptoms on Valproic Acid[9] ("Depakote") and Seroquel. One recent episode on Valproic Acid was really bad, where her legs felt weak and uncoordinated and she had tremors and ended up in the ER.

Plaintiff next presented to Dr. Younous on September 5, 2007 (R. 414). She had had two episodes of uncoordination. Her mood was good and her affect pleasant and friendly. No follow up appointment was made, although it was recommended she call for an appointment if symptoms got worse.

During the administrative hearing held on November 26, 2007, Plaintiff testified that she lived with her husband and their two children. They had a son who would be 3 on November 30th and a daughter who was 10 months old (R. 25). She testified there had still not been a definitive diagnosis for the leg tremors and weakness, except for conversion disorder which was "what they had come up with" (R. 26). Plaintiff had not been on any psychiatric medications since August or September, which was also when she last saw her psychiatrist, Dr. Younus. She was to see the psychiatrist if she became depressed, but had not been depressed since that time. She had been taking Lithium until she became pregnant with her second child. She was taken off the Lithium due to birth defects linked to it, but had not been put back on the medication after the birth of her child,

_____

[9]Trade name Depakote, Valproic acid is used alone or with other medications to treat certain types of seizures. It is also used to treat mania in people with bipolar disorder. National Institute for Health, www.ncbi.nlm.nih.ogv/pubmedhealth/PMH0000977, visited August 5, 2010.

because her tremor and weakness problems seemed to lessen after she discontinued it. She testified she then became very depressed again so Dr. Younus tried Depakote, but Plaintiff ended up in the ER afterward, "because it gave me tremors really bad and the walking was really bad with it."

Although Plaintiff testified the tremors and walking difficulty got "a lot better" after the Lithium was discontinued, she still had those problems. She testified they still occurred about once every month to six weeks and would last for an hour to two (R. 33). The tremors were in her arms and head and the weakness was in both legs. In the past month, however, she had had an episode "at least weekly." They lasted an hour or two. She did not know the reason for the increase because she was not taking Lithium and she was not under any added stress.

Plaintiff testified the tremors and weakness also in themselves caused depression because it was "scary" and she did not know what was causing them (R. 17). She continued to worry that it may come back like it did before where she was having the problem on a daily basis. Plaintiff was on no medications for the bipolar disorder in effect because the doctors could not find anything she could take without causing serious side effects.

Regarding her daily activities, Plaintiff testified she got up with her children and fed them. Sometimes her mother would come down and help when she was having difficulties with the tremors but the Plaintiff mostly spent her day caring for the children. The Plaintiff would do some of the cooking, laundry and grocery shopping. Her husband helped a good bit as well. Plaintiff's eye twitched, but she added: "I can drive okay. I don't go very far by myself due to difficulty with eye because I can't see very well when that happens." She enjoyed fishing but it was hard to find a sitter. The family might go to the movies once a month or out to eat maybe once weekly. She visited her sisters four or five times a month (R. 48-50).

Plaintiff testified she was 5'4" and weighed about 340 pounds. She was currently taking Metformin for diabetes, Labetalol for high blood pressure, and aspirin for Leiden factor, which causes abnormal clotting (R. 34). Plaintiff stated she watched her carbohydrates but probably didn't do as well as she should (R. 42).

Plaintiff testified she worked at the FBI for about eight years. She started out as a clerk and then went to a typing/data entry position. She last worked in the NICS department as a legal instruments examiner and was sitting at a desk most of the day. Before her employment with the FBI she worked as a cashier/manager at Dee's Family Video in Shinnston for four years (R. 45-47).

The ALJ then asked the Vocational Expert ("VE") if there would be any jobs available in the national economy for a hypothetical individual of Plaintiff's age and education and work experience, who would be able to perform a range of light work (except no climbing ladders, ropes, scaffolds, stairs or ramps), no balancing and no more than occasional stooping and crouching and no kneeling and crawling. There would be no exposure to extreme cold and no exposure to significant workplace hazards like heights or dangerous moving machinery. There would be no fast paced or assembly line work. The person should be able to miss up to one day of work per month. The VE testified Plaintiff would be able to do her two prior jobs. The VE testified Plaintiff could also work as a mail clerk and a call out operator which would be at the light exertional level. Depending upon the employer, the VE testified a person could miss one to two workdays a month but that an employer would want the individual to stay on task at least 90 percent of the time. If that individual were needing an hour to take some time to have the symptoms pass that individual may lose her employment. The VE testified there would be a significant number of jobs in the national economy as well as in West Virginia. (R. 57-59).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ McDougal made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since July 1, 2005, the alleged onset date (20 CFR 404.1520(b) and 404.1571 et seq.).

3. The claimant has the following severe impairments; diabetes mellitus; obesity; hypertension; bipolar disorder; and conversion disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520 (d), 404.1525 and 404.1526).

5. Based on all available evidence, the undersigned finds that the claimant retains the residual functional capacity to perform the exertional demands of light work, or work which requires maximum lifting of twenty pounds and frequent lifting ten pounds; some light jobs are performed while standing , and those performed in the seated position often require the worker to operate hand or leg controls (20 CFR 404.1567 and 416.967). In addition, the claimant has the following exertional and non-exertional limitations; she can do no work that requires climbing ropes, ladders, scaffolds, stairs or ramps; she can do no balancing, kneeling, or crawling; she can do no work that requires more than occasional stooping or crouching; she can do no work that requires exposure to extreme cold; she can do no work that requires exposure to significant workplace hazards like heights or dangerous moving machinery; she can do no work that requires completion of fast-paced or assembly line work; and she must be able to miss up to one day of work per month.

6. The claimant is capable of performing past relevant work as an FBI clerical worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2005 through the date of this decision (20 CFR 404.1520(f)).

(R. 12-19).

## IV.  Discussion
### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B.  Contentions of the Parties

Plaintiff contends:

The Administrative Law Judge's Conclusion that Mrs. Casto could return to her past relevant work is not supported by substantial evidence because:

1.    The Administrative Law Judge failed to explicitly address whether Mrs. Casto suffered from episodes of difficulty walking and tremors.

2.    To the extent that his finding concerning these symptoms is implied in the ALJ's credibility finding, this finding is not supported by substantial evidence.

3.    Furthermore, because the Administrative Law Judge did not include the claimant's episodes of difficulty walking and tremors in his questioning of the vocational expert, the testimony of the vocational expert is not substantial evidence to support the Commissioner's decision.

4. The Administrative Law Judge did not address the opinion of the State agency psychologist, Dr. Kuzniar, that Mrs. Casto's ability to carry out routine instructions and to manage social interactions would be somewhat reduced when the bipolar symptoms were evident. (Plaintiff's Memorandum in Support of Motion for Summary Judgment at p. 13).

Defendant contends:

Substantial evidence supports the ALJ's finding that Plaintiff was capable of performing her past relevant work because:

1. The ALJ's RFC Assessment accounted for all of Plaintiff's work-related functional limitations that were supported by the record.

2. The ALJ stated that he did not fully adopt the conclusions of the state agency consultants with regard to Plaintiff's physical and mental abilities because their restrictions were more extreme than what was warranted by the evidence of record.

### C. Walking Difficulties and Tremors.

Plaintiff first contends the Administrative Law Judge failed to explicitly address whether Mrs. Casto suffered from episodes of difficulty walking and tremors. Defendant contends the ALJ's RFC accounted for all of Plaintiff's work-related functional limitations that were supported by the record. A review of the ALJ's decision shows that he did not explicitly address walking problems or tremors. He did not specifically identify these as alleged impairments, severe or otherwise. He also did not reject such impairments.

Plaintiff was observed by doctors to have an episode of ataxia and head bobbing on July 3, 2005, relieved with Ativan. Dr. Younus referred Plaintiff to Dr. Azzouz for her "walking problems." Dr. Azzouz diagnosed intermittent speech and gait symptoms. She was referred to the university neurology clinic, and then to the Cleveland Clinic for her "walking problems." From there she was referred to the "movement disorders" clinic, where she was diagnosed with a continuing intermittent gait abnormality. She was diagnosed with either dystonia or conversion disorder. Dr. Kuenzler

noted astasia-abasia and also began to suspect a conversion disorder. Plaintiff's primary care physician referred her to physical therapy and podiatry for her walking problems. He also observed spasm of the right eyelid. Significantly, no medical provider found that Plaintiff was exaggerating her symptoms.

Had the ALJ found that Plaintiff had no walking problems or tremors, even intermittent, that decision would not be supported by substantial evidence. The ALJ did find, however, that Plaintiff had the severe impairment of "conversion disorder." By so finding, he implied she had tremor and/or walking problems, since conversion disorder was only discussed by physicians and psychologists in regard to those physical problems. The undersigned therefore finds that, although the ALJ did not explicitly address Plaintiff's walking difficulties and tremors, he did acknowledge she suffered from those symptoms to an extent that they were severe–that is, they significantly limited Plaintiff's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c), 416.920(c).

### D. Credibility

Plaintiff next argues that the ALJ's credibility finding is not supported by substantial evidence. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain,

or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594. The ALJ here found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, which, as already found, must include tremors and walking problems. She therefore met her threshold obligation under Craig.

The ALJ next was required to evaluate Plaintiff's credibility by taking into account her statements as well as "all the available evidence." Although the ALJ did consider her statements, medical history, signs, laboratory findings, objective medical evidence and her daily activities, the undersigned finds a flaw in his credibility analysis. As already found, the ALJ expressly found Plaintiff had the severe impairment of a conversion disorder. As provided in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) ("DSM-IV"):

The essential feature of Conversion disorder is the presence of symptoms or deficits affecting voluntary motor or sensory function that suggest a neurological or other general medical condition . . . .
Psychological factors are judged to be associated with the symptoms or deficit, a

judgment based on the observation that the initiation or exacerbation of the symptom or deficit is preceded by conflicts or other stressors . . . .

The symptoms <u>are not intentionally produced or feigned</u>, as in Factitious Disorder or Malingering[10] . . . .

The problem must be clinically significant as evidenced by marked distress; impairment in social, occupational, or other important areas of functioning; or the fact that it warrants medical evaluation.

(Emphasis added). By finding Plaintiff had a conversion disorder which was severe, the ALJ necessarily found she had walking problems/tremors. By finding she had a conversion disorder that was severe, he also found she was not feigning the physical conditions.

The undersigned finds another flaw in the ALJ's credibility analysis. Besides the conversion disorder, the ALJ also found Plaintiff had severe bipolar disorder. 20CFR 404.1529(c) describes the kind of evidence that the adjudicator <u>must</u> consider in addition to the objective medical evidence when assessing the credibility of an individual's statements, including: 1) factors that precipitate and aggravate the symptoms, and 2) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate the symptoms. Several of Plaintiff's physicians, including her treating physicians, opined that her physical symptoms were caused by medications for her bipolar disorder. At times she stopped taking the medications, her physical symptoms lessened or even disappeared. Her treating primary care physician opined that lithium may be at the root of all her physical problems, and later noted "coincidentally since she has been off the lithium, she has not experienced any more increased fatigue or tremor."

At the same time, on a number of occasions, Plaintiff suffered increased psychological problems when she was weaned off her bipolar medications. On July 3, 2005, the day after her alleged onset date, she was admitted to the hospital, diagnosed with bipolar disorder, recently

---

[10] As already noted, Plaintiff was specifically found not to have a factitious disorder.

depressed, with a Global Assessment of Functioning ("GAF") of 20-30. She was prescribed Lithium and her psychological symptoms lessened to the extent she was released with a GAF of 55-60. Only two weeks later, however, Plaintiff reported having muscle weakness that frightened her. A month later she reported her legs "weren't working right." They felt weak and uncoordinated.

Plaintiff's treating physician found Plaintiff's bipolar disorder was under control with lithium. When Plaintiff became pregnant in about May 2006, her lithium was discontinued due to risk of birth defects. Her psychiatrist noted in November 2006, that without medication she was a little more moody, some days better than others. Her affect was tense, gloomy, worried and tearful and her thought content was of hopelessness and helplessness. On another occasion she seemed anxious and stressed out. Shortly after having the baby, and while still off medications, Plaintiff was noted to be extremely irritable, had crying spells, and was not doing well. Her treating psychiatrist said she would need to restart medications, but meanwhile was to go to the ER if her symptoms worsened. At therapy, Plaintiff reported crying spells three to four times a day. The psychologist found her affect anxious, fearful, depressed, worried, tearful and overwhelmed. The psychiatrist also noted Plaintiff had been on Lithium before she got pregnant, but was taken off it due to the risk of birth defects.

Plaintiff became very depressed again, but because both the psychiatrist and psychologist believed her physical symptoms were due to Lithium, the psychiatrist tried Depakote instead. According to Plaintiff's testimony, she then ended up in the ER, "because it gave [her] tremors really bad and the walking was really bad with it."

The ALJ and Defendant are both correct that Plaintiff's physical symptoms were greatly lessened by the time of the Administrative Hearing in November 2007. She testified she had the

physical tremors and walking problems approximately once a month or every six weeks. Her neurologist a year earlier (while she was pregnant and on no medications) reported that her tremors occurred once every other month, although "prior to her pregnancy they could occur on a daily basis and last a week or so." Even if her symptoms were not disabling at the time of the hearing, they may have been for some period of time during the time frame at issue.

At the time of the hearing, Plaintiff testified her doctors had not yet found a medication for her psychological impairments that did not cause severe side effects. Because the ALJ did not take into account the medical treatment Plaintiff underwent to lessen her psychological symptoms, and the side effects the medications caused, the undersigned finds substantial evidence does not support his credibility determination.

Plaintiff also argues that the facts upon which the ALJ relied to find her not credible "have nothing to do with whether she had episodes of weakness of the legs and tremors." The ALJ's discussion of Plaintiff's credibility includes the following:

> . . . . The claimant's work activity ceased shortly after the birth of her first child, and she filed for disability shortly before becoming pregnant with her second child . . . . .

This factual scenario is not correct, however. Plaintiff had her first baby the end of November 2004. Her alleged onset date is in July 2005, seven months later. She had gone back to work, shortly after then, in what the ALJ himself referred to as an unsuccessful work attempt. She did not actually file her application until February 2006, a year and two months after the first baby was born and nearly a year before she even became pregnant with the second.

Upon consideration of all which, the undersigned finds substantial evidence does not support the ALJ's credibility determination.

## E. State Agency Opinions

Plaintiff finally argues that the Administrative Law Judge did not address the opinion of the State agency psychologist, Dr. Kuzniar, that Mrs. Casto's ability to carry out routine instructions and to manage social interactions would be somewhat reduced when the bipolar symptoms were evident. Defendant contends that argument is without merit because the ALJ stated that he did not fully adopt the conclusions of the state agency consultants with regard to Plaintiff's physical and mental abilities because their restrictions were more extreme than what was warranted by the evidence of record.

On May 8, 2006, State agency reviewing psychologist Bob Marinelli, Ed.D. opined Plaintiff had moderate limitations in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. He concluded:

> Claimant's MRFC is reduced by moderate limitations in sustained persistence. She has the capacity for routine competitive employment involving short & simple to mildly complex instructions with low pressure demands.

(Emphasis added). Dr. Marinelli also completed a Psychiatric Review Technique ("PRT") of Plaintiff that same date based on 12.04, Bipolar Syndrome (R. 289). He opined that Plaintiff would have a mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and had had one or two episodes of decompensation, each of extended duration, but also noted that her concentration, task completion and social functioning would be reduced during periods of mania or depression. Significantly, Dr. Marinelli also found that Plaintiff's reports of functioning were consistent with her MER and were credible.

On August 9, 2006, State agency reviewing psychologist Joseph Kuzniar, Ed.D., completed an MRFC and PRT, based on 12.04 for Bipolar Disorder (R. 385-402). In his MRFC, Dr. Kuzniar opined that Plaintiff would be moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. He added:

> The RFC ratings shows the capacity to carry out routine instructions and the capacity to manage social interaction demands. <u>When the symptoms of the bipolar impairment are evident, the capacity to carry out routine instructions is somewhat reduced and as [sic] are the capacity to manage social interactions. The capacity for adaptation is less than markedly reduced.</u>

(Emphasis added). In his PRT Dr. Kuzniar opined Plaintiff would have mild restriction of activities of daily living and mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and had had one or two episodes of decompensation, each of extended duration, but noted reports that she had problems with her bipolar disorder when stressed and not on medications and <u>would do things out of character</u>. Again, significantly, Dr. Kuzniar also found Plaintiff's report of limitations were generally consistent with the MER and were fully credible.

20 CFR § 404.1527(f)(2) provides:

(i)Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence,

except for the ultimate determination about whether you are disabled.

(ii) When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician or psychologist, the administrative law judge will evaluate the findings using relevant factors in paragraphs (a) through (e) of this section, such as the phsycian's or psychologist's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations provided by the physician or psychologist, and any other factors relevant to the weighing of opinions. Unless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

Here, no treating source opinion was given controlling weight. The ALJ was therefore required to explain the weight given to Dr. Marinelli and Dr. Kuzniar's opinions. In this regard the ALJ stated:

State Agency physicians completed PRTFs and mental and physical residual functional capacity assessments upon review of the claimant's medical file . . . . The undersigned has considered these opinions and, while a little too pessimistic in terms of physical and mental capabilities, they do show an ability to work full-time. The undersigned assigns them some weight but raises the physical to the full range of light work, based on the testimony and medical records, which tend to show more capability than claimant claims.

Again, what both State agency psychologist opined was that, although Plaintiff generally had only mild to moderate limitations, she would be more limited during times when she had bipolar symptoms. Significantly, neither State reviewing psychologist discussed the possibility of Plaintiff's having a conversion disorder, and the limitations that may be associated therewith. It is unlikely that adding conversion disorder to the diagnoses, as the ALJ did, would actually lessen Plaintiff's limitations, and may actually have caused the psychologists' opinions to be even more restrictive. The ALJ's only explanation of the weight given these experts was that they were "a little too pessimistic" and he accorded them "some" weight, raising "the physical" to the full range of light work. The undersigned finds the ALJ does not adequately explain the weight ("some") he accorded

the psychological consultants, or the reasons for that weight. Further, while stating they showed an ability to work full-time, he does not discuss the limitations they found Plaintiff would have, especially if she was suffering from symptoms of her "severe" bipolar disorder.

The undersigned therefore finds substantial evidence does not support the weight accorded the State agency psychologists' opinions.

### F. Vocational Expert Testimony

Plaintiff next argues that because the ALJ did not include her problems with walking and tremors in his hypothetical to the VE, the testimony of the vocational expert is not substantial evidence to support the Commissioner's decision. Because the undersigned has already found the ALJ's credibility determination was not supported by substantial evidence, the undersigned cannot find that his RFC and resulting hypothetical tot he VE are supported by substantial evidence.

### V. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's application for DIB. I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 14] be **DENIED;** Plaintiff's Motion for Summary Judgment [Docket Entry 12] be **GRANTED in part** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3) and remanding this case to the Commissioner for further action in accordance with this Recommendation; and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _20_ day of August, 2010.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE